Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL IV

| PEDRO JUAN RIVERA TORRES<br><br>Apelante<br><br>v.<br><br>UNIVERSIDAD DE PUERTO RICO Y OTROS<br><br>Apelado | TA2025AP00500 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Caso Núm.: SJ2020CV02788<br><br>Sobre: Despido Injustificado (Ley Núm. 80) y otros |
| --- | --- | --- |

Panel integrado por su presidenta, la Jueza Ortiz Flores, el Juez Bonilla Ortiz y la Jueza Martínez Cordero.

*Martínez Cordero, jueza ponente*

**SENTENCIA**

En San Juan, Puerto Rico, a 8 de diciembre de 2025.

Comparece Pedro Juan Rivera Torres (en adelante, señor Rivera Torres o apelante) mediante un recurso de apelación para solicitarnos la revisión de la *Sentencia* emitida y notificada el 29 de agosto de 2025, por el Tribunal de Primera Instancia, Sala Superior de San Juan.[1] Mediante la *Sentencia* apelada, el foro primario declaró *Ha Lugar* la moción de sentencia sumaria incoada por la parte apelada. En consecuencia, desestimó con perjuicio la demanda interpuesta por el aquí apelante y le condenó al pago de cinco mil dólares ($5,000.00) en honorarios de abogado. Por otro lado, ordenó a la parte apelada a pagarle al señor Rivera Torres la suma de mil cuatrocientos treinta y siete dólares con cincuenta y un centavo ($1,437.51).

Por los fundamentos que expondremos, se *confirma* la *Sentencia* apelada.

---

[1] Sistema Unificado de Manejo y Administración de Casos del Tribunal de Primera Instancia (SUMAC TPI), a la Entrada Núm. 112.

I

El caso del título inició cuando, el 14 de mayo de 2020, el señor Rivera Torres interpuso una *Querella* mediante el procedimiento sumario provisto por la Ley Sumaria de Reclamaciones Laborales (Ley Núm. 2),[2] contra la Universidad de Puerto Rico (UPR); José R. Ortiz Ubarri y la sociedad legal de gananciales compuesta por él y Kariluz Dávila Díaz; Eliana Valenzuela Andrade y la sociedad legal de gananciales compuesta por ella y Fulano de Tal; y la Aseguradora X.[3] En síntesis, sostuvo que su despido fue injustificado, que fue objeto de difamación, y que sufrió discrimen en el empleo debido creencias religiosas y políticas. Dado a lo anterior, solicitó un resarcimiento económico por la pérdida de ingreso y beneficios, y por los daños emocionales sufridos por los alegados actos discriminatorios.

El 28 de agosto de 2020, compareció la Universidad de Puerto Rico mediante *Moción de desestimación parcial, conversión a procedimiento ordinario y prórroga.*[4] Alegó que la Ley Antidiscrimen de Puerto Rico (Ley Núm. 100)[5] era inaplicable a la UPR, por lo cual, solicitó la desestimación de las acciones fundadas en dicha ley. Añadió que el litigio debía tramitarse por la vía ordinaria y que el apelante debía ser instruido a someter una demanda enmendada en la cual se excluyera la ley antes mencionada.

De ahí, el 6 de septiembre de 2020, el señor Rivera Torres interpuso una *Moción solicitando que se anote rebeldía.*[6] Adujo, en síntesis, que el término provisto a la UPR para alegar había decursado por lo que debía anotársele la rebeldía. Además, el 14 de septiembre de 2020, presentó una *Moción en cumplimiento de orden*

---

[2] Ley Núm. 2 de 17 de octubre de 1961, 31 LPRA 3118 *et seq.*
[3] SUMAC TPI, a la Entrada Núm. 1.
[4] *Íd.*, a las Entradas Núm. 6 y 7.
[5] Ley Núm. 100 de 30 de junio de 1959, 29 LPRA 146 *et seq.*
[6] SUMAC TPI, a la Entrada Núm. 9.

*y solicitando que se elimine moción de la parte querellada.*[7] Esbozó que lo solicitado por la UPR no procedía por haber sido presentada fuera de término. A tenor, reiteró su solicitud de anotación de rebeldía. La UPR se opuso a la solicitud de anotación de rebeldía mediante escrito presentado el 17 de septiembre de 2020.[8]

En respuesta, el foro de instancia emitió dos (2) dictámenes el 11 de diciembre de 2020, notificados el 14 de diciembre de 2020.[9] El *primero* fue que, mediante *Resolució*n, denegó la solicitud de desestimación parcial, la solicitud sobre convertir el pleito al procedimiento ordinario y prórroga solicitada por la UPR.[10] El *segundo* dictamen fue anotar la rebeldía a la UPR, mediante *Orden.*[11]

Precisa puntualizar que, sobre ambos dictámenes, la UPR solicitó la revisión judicial mediante un recurso de *Certiorari* presentado ante esta Curia en el alfanumérico KLCE202001336. Mediante *Resolución* emitida el 17 de agosto de 2021, un panel hermano denegó la expedición del auto de *Certiorari.*[12] De ahí, el 20 de agosto de 2021, el tribunal de instancia emitió y notificó una *Sentencia Parcial*[13] mediante la cual se dio por desistida la causa de acción al amparo de la Ley Sobre Despidos Injustificados (Ley Núm. 80).[14]

En el interín, la UPR interpuso una petición de *Certiorari* ante el Alto Foro en el alfanumérico CC-2021-621, para que se revisara lo resuelto por este Tribunal de Apelaciones en el alfanumérico KLCE202001336.[15]

---

[7] SUMAC TPI, a la Entrada Núm. 10.
[8] *Íd.*, a la Entrada Núm. 12.
[9] *Íd.*, a las Entradas Núm. 15 y 16.
[10] *Íd.*, a la Entrada Núm. 14. Véase, además, el SUMAC TPI, a las Entradas Núm. 7 y 10.
[11] *Íd.*, a la Entrada Núm. 15.
[12] *Íd.*, a la Entrada Núm. 20.
[13] *Íd.*, a la Entrada Núm. 22.
[14] Ley Núm. 80 de 30 de mayo de 1976, 29 LPRA 185a *et seq.*
[15] SUMAC TPI, a la Entrada Núm. 24.

Entonces, mediante *Opinión* emitida el 27 de mayo de 2022, por la última instancia judicial, revocó la determinación de este Tribunal de Apelaciones mediante la cual denegó la expedición del auto de *Certiorari* y desestimó la causa de acción contra la UPR al amparo de la Ley Núm. 100;[16] revocó la anotación de rebeldía de la UPR; y ordenó la conversión de las restantes causas de acción al procedimiento ordinario, entiéndase, las reclamaciones por difamación, libelo, calumnia y las presentada al amparo del Artículo 1802 del Código Civil de 1930.[17]

Posteriormente, el 31 de marzo de 2023, el señor Rivera Torres presentó una *Demanda enmendad*a.[18] En su pliego, en síntesis, desistió de sus reclamaciones bajo la Ley Núm. 100[19] y la incoada bajo la Ley Núm. 80.[20] Solicitó partidas mayores a las solicitadas en la demanda inicial, en concepto de daños, pérdida de ingresos y beneficios.

En reacción, el 5 de abril de 2023, la UPR interpuso una *Oposición a "Moción en cumplimiento de orden"* y así como a la presentación de *"Demanda enmendada"*.[21] Adujo que la parte apelante presentó la demanda enmendada fuera del término concedido para ello, y que no cumplió con su obligación de mostrar causa válida para justificar su incumplimiento con el término concedido. Solicitó que el foro primario denegara la presentación de la demanda enmendada y desestimara el pleito. Mediante *Resolución,*[22] el Tribunal de Primera Instancia autorizó la demanda enmendada y dispuso el término que la parte apelada tendría disponible para contestar la demanda.

---

[16] Ley Núm. 100, *supra.*
[17] Art. 1802 del Código Civil de 1930, 31 LPRA § 5141(derogado). Véase, además, el SUMAC TPI, a las Entradas Núm. 35 y 36.
[18] SUMAC TPI, a la Entrada Núm. 41.
[19] Ley Núm. 100, *supra.*
[20] Ley Núm. 80, *supra.*
[21] SUMAC TPI, a la Entrada Núm. 44.
[22] *Íd.*, a la Entrada Núm. 51.

Subsiguientemente, el 27 de abril de 2023, la UPR solicitó término adicional para contestar la demanda enmendada.[23] De ahí, el 23 de mayo de 2023, la UPR presentó su *Contestación a demanda enmendada.*[24] En esencia, la mayoría de las alegaciones que surgen de la demanda enmendada fueron negadas. A tenor, solicitó que el foro primario declarase *no ha lugar* la demanda enmendada, condenando a la parte apelante al pago de costas y honorarios de abogados.

Luego, mediante *Orden* emitida el 27 de junio de 2023, notificada al día siguiente, el foro de instancia concedió término para que las partes sometieran el informe de manejo de caso y señaló la vista de conferencia inicial.[25] En cumplimiento, el 6 de julio de 2023, las partes presentaron el *Informe inicial para el manejo del caso.*[26] Consecuentemente, las partes iniciaron el descubrimiento de prueba y la vista sobre conferencia inicial fue celebrada.[27]

Así las cosas, el 13 de octubre de 2023, notificada el 17 del mismo mes y año, el foro primario dictó una *Sentencia Parcial* mediante la cual, al amparo de la Regla 4.3(c) de Procedimiento Civil,[28] desestimó sin perjuicio la acción presentada contra la sociedad legal de gananciales compuesta por José R. Ortiz Ubarri y Kariluz Dávila Díaz; así como contra la sociedad legal de gananciales compuesta por Eliana Valenzuela Andrade y Fulano de Tal.[29]

Luego, el 11 de diciembre de 2023, y el 12 de febrero de 2024, se celebró otra vista sobre el estado de los procedimientos.[30] En particular, durante la última de estas dos vistas, el foro de instancia

---

[23] SUMAC TPI, a la Entrada Núm. 50.
[24] *Íd.*, a la Entrada Núm. 54.
[25] *Íd.*, a la Entrada Núm. 62.
[26] *Íd.*, a la Entrada Núm. 63.
[27] *Íd.*, a la Entrada Núm. 66.
[28] Regla 4.3(c) de Procedimiento Civil, 32 LPRA Ap. V, R.4.3(c).
[29] SUMAC TPI, a la Entrada Núm. 69.
[30] *Íd.*, a las Entradas Núm. 72 y 81.

extendió el descubrimiento de prueba y estableció el calendario para la presentación de las mociones dispositivas.

De lo que sigue, el 6 de mayo de 2024, la UPR interpuso una *Moción de sentencia sumaria.*[31] Adujo que no existía controversia real y sustancial con relación a los hechos materiales del caso de epígrafe. Añadió que el apelante era un empleado transitorio, por lo cual, no tenía una expectativa de continuidad en el empleo. Alegó que, por error e inadvertencia por parte del Departamento de Recursos Humanos de la institución, se omitió procesar una enmienda realizada al contrato de empleo entre el apelante y la UPR, en la cual, el contrato culminaba el 31 de mayo de 2019. Por tal razón, la relación laboral culminó el 22 de mayo de 2019, nueve (9) días previos a lo pactado. Reconoció la deuda equivalente a la diferencia de días, específicamente por la cantidad de mil cuatrocientos treinta y siete dólares y cincuenta y un centavos ($1,437.51).

A tenor, solicitó al foro primario que dictara sentencia de conformidad a la cantidad adeudada en salarios. Añadió a su pliego, su solicitud la desestimación de las reclamaciones de discrimen por razón de creencias religiosas y afiliación política, difamación y libelo. Ello, en consideración a que ninguna de las causas de acción reunía los requisitos en derecho para sustentarlas.

---

[31] SUMAC TPI, a la Entrada Núm. 84. Véase, además, la *Moción suplementaria y en cumplimiento de orden,* presentada por la UPR el 13 de mayo de 2024 en el SUMAC TPI, a la Entrada Núm. 86. La parte apelada acompañó su petitorio sumario con los documentos siguientes: Anejo 1: Transcripción de Deposición de Pedro Juan Rivera Torres; Anejo 2: Contrato de Servicios Profesionales; Anejo 3: Declaración Jurada de José R Ortiz Ubarri; Anejo 4: Carta al Decano del 16 Jul 2018; Anejo 5: Contrato de Servicios Profesionales; Anejo 6: Notificación de Cambio de Transacción de Personal; Anejo 7: Contrato de Ccom; Anejo 8: Emails sobre Enmiendas al Contrato; Anejo 9: Cadena de Emails Sobre Fecha de Terminación; Anejo 10: Minutas de Reuniones; Anejo 11: Correo Electrónico; Anejo 12: Correo Electrónico; Anejo 13: Examen; Anejo 14: Examen; Anejo 15: Email; Anejo 16: Email; Anejo 17: Cadena de Emails Sobre Terminación de Contrato; Anejo 18: Declaración Jurada de Luis Colón Colón; Anejo 19: Emails; Anejo 20: Email; Anejo 21: Email; Anejo 22: Declaración Jurada de Eliana Valenzuela Andrade; Anejo 23: Email; Anejo 24: Email; Anejo 25: Email; Anejo 26: Certificación.

En reacción, el 3 de junio de 2024, el señor Rivera Torres incoó su *Oposición a solicitud de sentencia sumaria y otros extremos*.[32] En resumidas cuentas, negó muchas de las alegaciones según esbozadas en la solicitud de sentencia sumaria de la parte apelada. Enfatizó que existía controversia en los hechos materiales del caso de epígrafe, por lo cual, se opuso a la solicitud de la UPR. Sostuvo sus reclamaciones por incumplimiento de contrato alegando que la parte apelada tenía una obligación de extenderle su contrato de empleo por haber creado una expectativa de continuidad en el empleo. Por lo cual, estimó que procedía la imposición de una penalidad de mil cuatrocientos treinta y siete con cincuenta y un centavos ($1,437.51), equivalente a la suma igual a la adeudada por los salarios no pagados, en concepto de daños y perjuicios. De igual forma, enfatizó que procedían sus reclamaciones de discrimen por razones religiosas, difamación y libelo, no así, la reclamación de discrimen por razones políticas. Dado a lo anterior, peticionó al foro primario que denegara la solicitud de sentencia sumaria y dictara sentencia contra la parte apelada conforme a derecho.

Luego, el 27 de junio de 2024, la UPR interpuso una réplica.[33] Reiteró que no existía controversia real y sustancial en cuanto a los hechos materiales y pertinentes del caso de epígrafe. Adujo que la parte apelante no cumplió con los requisitos para controvertir los hechos según presentados por la parte apelada en la solicitud de sentencia sumaria. Añadió que la parte apelante no logró refutar la validez de su terminación de empleo, ni sostener sus reclamaciones por discrimen y difamación. Solicitó la imposición de sanciones a la parte apelante por el pago de honorarios de abogado incurridos por la parte apelada.

---

[32] SUMAC TPI, a la Entrada Núm. 92. La parte apelante acompañó su petitorio sumario con los documentos siguientes: Anejo 1: Declaración Jurada de Pedro J. Rivera; Anejo 2: Deposición de Ortiz Ubarri, Anejo 3: Deposición de Valenzuela.
[33] SUMAC TPI, a la Entrada Núm. 98.

En reacción, el 23 de julio de 2024, el señor Rivera Torres presentó una dúplica.[34] Sostuvo su oposición a la adjudicación sumaria del caso de epígrafe. Alegó que existían controversias que debían ventilarse en juicio ordinario dado a que se requería dirimir la veracidad de los testimonios. Solicitó al foro primario que declarase no ha lugar la solicitud de sentencia sumaria solicitada por la parte apelada.

Pasado algunos meses, el 17 de enero de 2025, el foro *a quo* dictó una *Sentencia Parcial* mediante la cual, al amparo de la Regla 4.3(c) de Procedimiento Civil,[35] desestimó sin perjuicio el caso contra el señor José R. Ortiz Ubarri.[36]

Finalmente, el 29 de agosto de 2025, el foro de instancia emitió y notificó la *Sentencia* apelada.[37] Mediante el dictamen apelado, el tribunal *a quo* declaró *Ha Lugar* la moción de sentencia sumaria incoada por la parte apelada. En consecuencia, desestimó con perjuicio la demanda interpuesta por el aquí apelante y le condenó al pago de cinco mil dólares ($5,000.00) en honorarios de abogado. Por otro lado, ordenó a la parte apelada a pagarle al señor Rivera Torres la suma de mil cuatrocientos treinta y siete dólares con cincuenta y un centavo ($1,437.51) por los salarios que la propia institución reconoció adeudar.

Como parte del dictamen apelado, la primera instancia judicial emitió las siguientes sesenta y ocho (68),[38] determinaciones de hechos:

i. Hechos generales

1. En agosto de 2017, la Parte Demandante completó una solicitud de empleo para trabajar mediante un "contrato de servicio" en la UPR. Véase, Hecho Incontrovertido Núm. 1 de la Moción de Sentencia Sumaria presentada por la Parte Demandada (en adelante "MSS") y aceptado por la Parte

---

[34] SUMAC TPI, a la Entrada Núm. 102.
[35] R.4.3(c), *supra.*
[36] SUMAC TPI, a la Entrada Núm. 110.
[37] *Íd.,* a la Entrada Núm. 112.
[38] *Íd.* Nótese que de la *Sentencia* apelada no se desprenden determinaciones de hechos enumeradas bajo los números doce (12) ni catorce (14).

Demandante en la Oposición a Moción de Sentencia Sumaria (en adelante "Oposición").

2.  El 1 de septiembre de 2017, la Parte Demandante suscribió un Contrato de Servicios Personales para trabajar como profesor en el Departamento de Ciencia de Cómputos del Recinto de Rio Piedras durante el año académico 2017-2018. Véase, Hecho Incontrovertido Núm. 2 de MSS y aceptado en la Oposición.

3.  De conformidad a sus propios términos, el Contrato de Servicios Personales suscrito por la Parte Demandante comenzaba el 1 de septiembre de 2017 y finalizaba el 31 de mayo de 2018. Véase, Hecho Incontrovertido Núm. 3 de MSS y aceptado en la Oposición.

4.  La cláusula SEGUNDA del Contrato de Servicios Personales suscrito por la Parte Demandante lee como sigue:

    > LAS PARTES expresamente reconocen que el presente contrato no implica ni crea ninguna expectativa de que será renovado o extendido más allá de la fecha de vencimiento que establece el mismo. Tampoco crea expectativa de nombramiento a un puesto regular en su sentido más amplio. Véase, Hecho Incontrovertido Núm. 4 de MSS y aceptado en la Oposición.

5.  El artículo "V" del primer Contrato de Servicios Personales suscrito por la Parte demandante lee de la siguiente manera:

    > V. NO DISCRIMEN: AMBAS PARTES hacen constar que no incurrirán en prácticas discriminatorias por razones de raza, color, sexo, orientación sexual o identidad de género, nacimiento, edad, origen o condición social, ascendencia, estado civil, ideas o creencias religiosas o políticas, condición de veterano de las Fuerzas Armadas o incapacidad física o mental en las prácticas de empleo, contratación y subcontratación. Véase, Hecho Incontrovertido Núm. 5 de MSS y aceptado en la Oposición.

6.  El Comité de Personal del Departamento de Ciencia de Cómputos tiene, como una de sus responsabilidades, examinar el desempeño de todos los profesores de la facultad, incluyendo a los profesores por contrato. El Comité de Personal también es responsable de recomendar a qué profesores se les habrá de ofrecer un contrato de servicios profesionales para el próximo año académico. Véase, Hecho Incontrovertido Núm. 6 de MSS.

7.  Ni el Director del Departamento, ni el Comité de Personal no tienen autoridad para extenderle un contrato de servicios a un profesor. Dicha autoridad recae sobre el Rector del Recinto de Rio Piedras. Véase, Hecho Incontrovertido Núm. 7 de MSS.

8.  El Comité de Personal del Departamento de Ciencia de Cómputos simple y llanamente hace recomendaciones, las cuales el Rector del Recinto de Rio Piedras aprueba o deniega conforme a distintos factores, incluyendo la disponibilidad de presupuesto. Véase, Hecho Incontrovertido Núm. 8 de MSS.

9. El Prof. Ortiz Ubarri fungía como Director del Departamento de Ciencia de Cómputos del Recinto de Rio Piedras. El Prof. Ortiz Ubarri también formaba parte del Comité de Personal de dicho Departamento. Véase, Hecho Incontrovertido Núm. 9 de MSS y aceptado en la Oposición.

10. Tras el vencimiento de su primer Contrato de Servicios Personales, el Comité de Personal recomendó la contratación de la Parte Demandante para dictar cursos en el próximo año académico 2018-2019. Véase, Hecho Incontrovertido Núm. 10 de MSS y aceptado en la Oposición.

11. Como resultado de lo anterior, el 20 de agosto de 2018, la Parte Demandante suscribió un segundo Contrato de Servicios Personales con la Universidad para ofrecer cursos durante el año académico 2018-2019, el cual vencía el 22 de mayo de 2019, y proveía para una remuneración total de $44,973.35. Véase, Hecho Incontrovertido Núm. 11 de MSS.

13. Más adelante, dicho contrato fue enmendado para extender la fecha de su vencimiento al 31 de mayo de 2019, y para obtener una remuneración total de $46,410.98. Véase, Hecho Incontrovertido Núm. 13 de MSS.

15. De conformidad a los expedientes de la Universidad, la Parte Demandante recibió una remuneración total de $44,973.47 por concepto del segundo Contrato de Servicios Personales. Véase, Hecho Incontrovertido Núm. 16 de MSS y aceptado en la Oposición.

16. Al igual que el primero, el segundo Contrato de Servicios Personales incluía una cláusula en la cual se establecía que el mismo no creaba expectativa alguna de que habría de ser renovado o extendido más allá de la fecha de su vencimiento y lee como sigue:

> LAS PARTES expresamente reconocen que el presente contrato no implica ni crea ninguna expectativa de que será renovado o extendido más allá de la fecha de vencimiento que establece el mismo. Tampoco crea expectativa de nombramiento a un puesto regular en su sentido más amplio. Véase, Hecho Incontrovertido Núm. 17 de MSS y aceptado en la Oposición.

17. Al igual que el primero, el segundo Contrato de Servicios Personales incluía una cláusula que prohibía las prácticas discriminatorias en el lugar de empleo y lee como sigue:

> V. NO DISCRIMEN: AMBAS PARTES hacen constar que no incurrirán en prácticas discriminatorias por razones de raza, color, sexo, orientación sexual o identidad de género, nacimiento, edad, origen o condición social, ascendencia, estado civil, ideas o creencias religiosas o políticas, condición de veterano de las Fuerzas Armadas o incapacidad física o mental en las prácticas de empleo, contratación y subcontratación. Véase, Hecho Incontrovertido Núm. 18 de MSS y aceptado en la Oposición.

18. El 7 de septiembre de 2018, el Comité de Personal del Departamento de Ciencia de Cómputos determinó reunirse con la Parte Demandante, al igual que con otra profesora,

para discutir los resultados de las evaluaciones estudiantiles. Véase, Hecho Incontrovertido Núm. 19 de MSS.

19. En atención a lo anterior, el Prof. Ortiz Ubarri se reunió personalmente con la Parte Demandante el 25 de septiembre de 2018. Véase, Hecho Incontrovertido Núm. 20 de MSS y aceptado en la Oposición.

20. Durante el mes de febrero de 2019, el Prof. Ortiz Ubarri comenzó a trabajar en la lista de ofrecimiento de cursos para el primer semestre del año académico 2019- 2020. Véase, Hecho Incontrovertido Núm. 21 de MSS y aceptado en la Oposición.

21. Como parte del proceso para confeccionar la oferta académica del próximo año, el Prof. Ortiz Ubarri se dio a la tarea de auscultar la disponibilidad de sus recursos, incluyendo a la Parte Demandante. Véase, Hecho Incontrovertido Núm. 22 de MSS y aceptado en la Oposición.

22. Al realizar dicha consulta, el Prof. Ortiz Ubarri nunca le dijo a la Parte Demandante, ni a ningún otro recurso, que le habría de extender un contrato para el próximo año académico. Véase, Hecho Incontrovertido Núm. 23 de MSS y aceptado en la Oposición.

23. En el borrador inicial de ofrecimiento de cursos que el Prof. Ortiz Ubarri preparó durante el mes de marzo de 2019, aparecía la Parte Demandante ofreciendo tres cursos durante el primer semestre. Véase, Hecho Incontrovertido Núm. 24 de MSS y aceptado en la Oposición.

24. Así las cosas, 1 de abril de 2019, una estudiante (Camila Vázquez Rodríguez) remitió una comunicación electrónica al Director del Departamento, Dr. Ortiz Ubarri, para quejarse de los exámenes de la Parte Demandante y del comportamiento de éste en el salón de clases. Véase, Hecho Incontrovertido Núm. 25 de MSS.

25. En atención a la queja antes descrita, así como las de otros estudiantes, el Comité de Personal se dio a la tarea de examinar los dos exámenes que habían sido ofrecidos por la Parte Demandante. Véase, Hecho Incontrovertido Núm. 26 de MSS.

26. El primer examen parcial que fue evaluado fue el que se ofreció el 27 de febrero de 2019. Véase, Hecho Incontrovertido Núm. 27 de MSS.

27. El segundo examen parcial que fue evaluado fue el que se ofreció el 27 de marzo de 2019. Véase, Hecho Incontrovertido Núm. 28 de MSS.

28. Tras examinar los exámenes de la Parte Demandante, el 7 de abril de 2019, la Prof. Remi Megret, quien pertenecía al Comité de Personal, reaccionó a los mismos por correo electrónico con los siguientes comentarios: "Offensive keywords or topics are not appropriate", "Too many problems rely on obfuscated code, or that include confusing code layout or variable names" y "Only 5/100 pts require an

explanation", entre otros. Véase, Hecho Incontrovertido Núm. 29 de MSS.

29. Tras examinar los exámenes de la Parte Demandante, el 8 de abril de 2019, la Prof. Patricia Ordóñez, quien también pertenecía al Comité de Personal, reaccionó a los mismos por correo electrónico dejando saber que a su juicio, los exámenes eran "supremamente inadecuados que no puede ni comentarlos". Véase, Hecho Incontrovertido Núm. 30 de MSS.

30. Durante reunión celebrada el 9 de abril de 2019, el Comité de Personal tomó la determinación de no recomendar la renovación del contrato de la Parte Demandante para el próximo año académico 2019-2020. Véase, Hecho Incontrovertido Núm. 31 de MSS.

31. El 27 de abril de 2019[,] se publicó la lista de ofrecimiento de cursos que el Dr. Ortiz Ubarri preparó allá para el mes de marzo, en el cual aparecía el nombre de la Parte Demandante como recurso. Véase, Hecho Incontrovertido Núm. 33 de MSS y admitido en la Oposición.

32. El 29 de abril de 2019, se removió la lista de ofrecimiento de cursos que fue colocada el 27 de abril de ese mismo año, y se sustituyó por otra en donde ya no aparecía la Parte Demandante, reemplazando su nombre por la frase "To Be Assigned" ("TBA"). Véase, Hecho Incontrovertido Núm. 36 de MSS y admitido en la Oposición.

33. Desde el 29 de abril de 2019, la Parte Demandante conocía que no estaba nombrado en el listado de ofrecimiento de cursos del primer semestre del año escolar 2019- 2020. Véase, Hecho Incontrovertido Núm. 37 de MSS y admitido en Oposición.

34. El 1 de mayo de 2019, esto es, dos (2) días después de haber sido removido de la lista de ofrecimientos de cursos, el Prof. Ortiz Ubarri envió un correo electrónico a la Parte Demandante informándole que su contrato habría de vencer el 31 de mayo de 2019, y que el mismo no habría de ser renovado para el próximo año académico. Véase, Hecho Incontrovertido Núm. 38 de MSS y admitido en la Oposición.

35. Desde el 1 de mayo de 2019, esto es, treinta (30) días antes de que venciera su segundo Contrato de Servicios Personales, la Parte Demandante conocía que su contrato no se habría de extender para el próximo año académico. Véase, Hecho Incontrovertido Núm. 30 de MSS y admitido en Oposición.

36. Mediante correo electrónico del 2 de mayo de 2019, la Parte Demandante requirió conocer la razón por la cual no se le habría de renovar su contrato. Véase, Hecho Incontrovertido Núm. 40 de MSS y admitido en la Oposición.

37. La única respuesta que la Parte Demandante recibió de la UPR fue la expresada en el correo electrónico del Prof. Ortiz Ubarri el 6 de mayo de 2019, en el cual se le indicó que la UPR no venía en la obligación de renovar su contrato y que la determinación fue tomada por el Comité de Personal.

Véase, Hecho Incontrovertido Núm. 41 de MSS y admitido en la Oposición.

38. El Dr. Ortiz Ubarri nunca le dijo a la Parte Demandante que su contrato habría de ser renovado para el año académico 2019-2020. Véase, Hecho Incontrovertido Núm. 44 de MSS y admitido en la Oposición.

ii. Hechos relacionados a la causa de acción de discrimen por creencias religiosas

39. Durante el período de tiempo en que la Parte Demandante trabajó para la Universidad, el Prof. Ortiz Ubarri desconocía cuáles eran, si alguna, las creencias religiosas de la Parte Demandante. Véase, Hecho Incontrovertido Núm. 46 de MSS.

40. La Parte Demandante no cuenta con alguna persona con conocimiento personal que pueda declarar que la razón por la cual no se le renovó su contrato o se le terminó el mismo, fue por sus creencias religiosas. Véase, Hecho Incontrovertido Núm. 47 de MSS y admitido en Oposición.

41. La Parte Demandante tampoco cuenta con algún email, documento o comunicación que establezca que la razón por la cual no se le renovó su contrato con la Universidad, o se terminó el mismo, fue por sus creencias religiosas. Véase, Hecho Incontrovertido Núm. 48 de MSS y admitido en Oposición.

42. La Parte Demandante ampara su alegación de discrimen en su mera "creencia". Véase, Hecho Incontrovertido Núm. 51 de MSS y admitido en Oposición.

43. El Prof. Ortiz Ubarri nunca le dijo a la Parte Demandante que no le habría de renovar el contrato o terminar el mismo por razón de sus creencias religiosas. Véase, Hecho Incontrovertido Núm. 52 de MSS y admitido en Oposición.

44. La Parte Demandante no cuenta con algún testigo que pueda declarar que el Prof. Ortiz Ubarri no le renovó su contrato o terminó el mismo por razón de sus creencias religiosas. Véase, Hecho Incontrovertido Núm. 53 de MSS y admitido en Oposición.

45. La Parte Demandante tampoco cuenta con ningún documento que establezca que el Prof. Ortiz Ubarri no le renovó su contrato o le terminó el mismo por razón de sus creencias religiosas. Véase, Hecho Incontrovertido Núm. 54 de MSS y admitido en Oposición.

46. La Parte Demandante no formaba parte del Comité de Personal del Departamento de Ciencia de Cómputos, ni formaba parte del grupo de personas que tomaba la decisión de renovar los contratos a los profesores. Véase, Hecho Incontrovertido Núm. 55 de MSS.

47. La Parte Demandante no sabe cuántas veces se reunió el Comité de Personal para discutir si se le habría o no de renovar el contrato. Véase, Hecho Incontrovertido Núm. 56 de MSS.

48. La Parte Demandante tampoco sabe quiénes estuvieron presentes en tales reuniones. Véase, Hecho Incontrovertido Núm. 57 de MSS.

49. La Parte Demandante desconoce el día, así como el lugar en donde se llevaron a cabo dichas reuniones. Véase, Hecho Incontrovertido Núm. 58 de MSS.

50. La Parte Demandante también desconoce cuáles fueron los argumentos que se levantaron en pro o en contra de si se le renovaba o se le terminaba el contrato. Véase, Hecho Incontrovertido Núm. 59 de MSS.

51. La Parte Demandante desconoce si las razones por las cuales el comité decidió no renovarle el contrato están relacionadas con sus creencias religiosas. Véase, Hecho Incontrovertido Núm. 60 de MSS.

52. La Parte Demandante desconoce si el Prof. Ortiz Ubarri fue la única persona envuelta en la contratación de la Sra. Lluveres, y si hubo otras personas envueltas en dicha contratación. Véase, Hecho Incontrovertido Núm. 62 de MSS y admitido en la Oposición.

53. La Parte Demandante desconoce cuáles fueron los criterios que fueron utilizados para contratar a la Sra. Lluveres. Véase, Hecho Incontrovertido Núm. 63 de MSS y admitido en la Oposición.

54. La Parte Demandante desconoce si la Sra. Lluveres cumplía con todos los requisitos para ser contratada. Véase, Hecho Incontrovertido Núm. 64 de MSS y admitido en la Oposición.

55. La Parte Demandante desconoce si de las personas que fueron entrevistadas, la Sra. Lluveres fue la que mejor preparada estaba. Véase, Hecho Incontrovertido Núm. 65 de MSS y admitido en la Oposición.

56. La Parte Demandante desconoce los criterios específicos que fueron examinados por la Universidad para determinar si la Sra. Lluveres era la mejor candidata. Véase, Hecho Incontrovertido Núm. 66 de MSS y admitido en la Oposición.

57. La Parte Demandante desconoce cuántas veces entrevistaron a la Sra. Lluveres, la fecha en la cual la entrevistaron, ni quienes la entrevistaron. Véase, Hecho Incontrovertido Núm. 67 de MSS y admitido en la Oposición.

58. La Parte Demandante desconoce si las personas que entrevistaron a la Sra. Lluveres conocían de las creencias religiosas de la Sra. Lluveres al momento de contratarla. Véase, Hecho Incontrovertido Núm. 68 de MSS y admitido en la Oposición.

59. La Parte Demandante no puede afirmar bajo juramento que a la Sra. Lluveres se le contrató por razón de sus creencias religiosas. Véase, Hecho Incontrovertido Núm. 69 de MSS y admitido en la Oposición.

iii. Hechos relacionados con la reclamación de difamación

60. El 9 de octubre de 2019, el Director del Departamento de Ciencia de Computadora de Arecibo, Dr. Luis Colón Colón, envió un email intitulado: "ACTUALIZACIÓN DE BANCO DE TALENTOS Y ACERVO DE CANDIDATOS A CONTRATACIÓN DEL DEPARTAMENTO DE CIENCIA DE COMPUTADORAS DE LA UPR ARECIBO" a Sarah I. Ferrer, Oficial Administrativo, del Recinto Universitario de Mayagüez. Véase, Hecho Incontrovertido Núm. 70 de MSS y admitido en la Oposición.

61. En respuesta a dicha comunicación, la Parte Demandante remitió su Currículum Vitae al Prof. Colón mediante correo electrónico del 25 de octubre de 2019. Véase, Hecho Incontrovertido Núm. 72 de MSS y admitido en la Oposición.

62. En atención a la comunicación de la Parte Demandante, se convocó a los profesores del Departamento de Ciencia de Computadora del Recinto de Arecibo para entrevistarlo el 3 de diciembre de 2019, a las 10:30 a.m. Véase, Hecho Incontrovertido Núm. 73 de MSS y admitido en la Oposición.

63. La Parte Demandante fue entrevistado por el Comité de Personal del Departamento de Ciencia de Cómputos de Arecibo, el cual se encontraba compuesto por los profesores de dicho departamento, incluyendo a la Prof. Eliana Valenzuela. Véase, Hecho Incontrovertido Núm. 74 de MSS y admitido en la Oposición.

64. La Parte Demandante no trajo consigo, ni entregó alguna evaluación durante la entrevista en Arecibo. Véase, Hecho Incontrovertido Núm. 75 de MSS y admitido en la Oposición.

65. Después de completada la entrevista, la Prof. Valenzuela, como parte del Comité de Personal de Arecibo, se comunicó con el Prof. Ortiz Ubarri para pedir referencias de la Parte Demandante. Véase, Hecho Incontrovertido Núm. 76 de MSS.

66. La Parte Demandante no sabe si la Prof. Valenzuela dijo que él se había "propasado" con una estudiante. Véase, Hecho Incontrovertido Núm. 81 de MSS y admitido en la Oposición.

67. La Parte Demandante no fue a donde la Dra. Valenzuela a preguntarle si era cierto que ella dijo que él se había "propasado" con una estudiante. Véase, Hecho Incontrovertido Núm. 82 de MSS y admitido en la Oposición.

68. Fue el Prof. Colón quien, a iniciativa propia, le preguntó de manera directa a la Parte Demandante si la razón por la cual no se le había renovado su contrato en Rio Piedras fue por haberse "propasado" con alguna estudiante. Véase, Hecho Incontrovertido Núm. 85 de MSS y admitido en la Oposición.[39]

En *primer* lugar, en la *Sentencia* apelada, el foro de instancia resolvió desestimar la causa de acción sobre discrimen político

---

[39] SUMAC TPI, a la Entrada 112.

interpuesta por el apelante luego de que este se hubiese allanado. De igual forma, dispuso que procedía la desestimación de la causa de acción sobre difamación, tras concluir que no se configuraba el elemento "publicación".

En lo relativo al alegado incumplimiento de contrato alegado por el apelante, concluyó que no procedía imponer penalidad a favor del apelante por la deuda reconocida por la UPR, tras su error en el un cómputo y haber admitido su deuda. En lo relativo a la expectativa de continuidad en el empleo, concluyó que no le asistía, por lo que la UPR no incumplió el contrato.

Por otro lado, concluyó que procedía la desestimación de la causa de acción sobre discrimen por insuficiencia de la prueba; no procedía la imposición de penalidad en la suma de dinero reconocida como adeudada al apelante; y que el apelante había sido temerario durante el trámite del caso por lo que procedía la imposición de honorarios por temeridad.

Insatisfecho con el resultado, el 15 de septiembre de 2025, el señor Rivera Torres interpuso una *Moción de reconsideración.*[40] Adujo, entre otras cosas, que la evidencia presentada por la parte apelada para sustentar la solicitud de sentencia sumaria era inadmisible. Por un lado, alegó que había evidencia que no podía ser autenticada o validada. Por otro lado, añadió que se trataba de documentos de su propia autoría, los cuales fueron difundidos a terceros sin su autorización. Añadió que debía imponerse la penalidad solicitada a la parte apelada conforme a derecho. A tenor, solicitó al foro primario que reconsiderase la admisibilidad de evidencia presentada por la parte apelada en la Moción de Sentencia Sumaria y, en su consecuencia, dejara sin efecto la desestimación de la causal de discrimen y la imposición de honorarios de abogado.

---

[40] SUMAC TPI, a la Entrada Núm. 113.

Ello, debido a que, a su juicio, existían varias controversias medulares que requerían dirimir la veracidad de los testimonios y que no permitían que se dictara sentencia sumariamente.

Por su parte, el 26 de septiembre de 2025, la parte apelada presentó su *Oposición a "Moción de reconsideración"*.[41] Sostuvo, entre otras cosas, que los documentos adjuntados a la solicitud de sentencia sumaria cumplían con los requisitos para ser admitida, por lo cual, no procedían los planteamientos del señor Rivera Torres. Solicitó que se declarara no ha lugar la moción de reconsideración presentada por el apelante.

En respuesta, mediante *Orden* emitida el 30 de septiembre de 2025, notificada el 1 de octubre de 2025, el tribunal de instancia declaró *No Ha Lugar* la solicitud de reconsideración.[42]

En desacuerdo, el 30 de octubre de 2025, compareció el apelante mediante un recurso de apelación el cual esbozó los siguientes tres (3) señalamientos de error:

A. Erró el Tribunal de Primera Instancia al no imponer la doble penalidad en la sentencia por alegada inexistencia de una penalidad en ley.

B. Erró el Tribunal de Primera Instancia al resolver sumariamente la controversia en torno al discrimen religioso utilizando prueba inadmisible y por existir alegaciones encontradas.

C. Erró el Tribunal de Primera Instancia al imponer honorarios por temeridad en una reclamación laboral en contraposición a la política impuesta en la Ley Núm. 402 de 12 de mayo de 1950, según enmendada.

El 1 de diciembre de 2025, compareció la parte apelada mediante *Alegato de la parte apelada*. Con el beneficio de la comparecencia de las partes, procederemos a disponer del recurso instado.

---

[41] SUMAC TPI, a la Entrada Núm. 115.
[42] *Íd.*, a la Entrada Núm. 116.

II

## A. La Sentencia Sumaria

El mecanismo procesal de sentencia sumaria es un remedio discrecional extraordinario que, únicamente, se concederá cuando la evidencia que se presente con la moción establezca con claridad la existencia de un derecho.[43] El propósito de este mecanismo procesal es facilitar la solución justa, rápida y económica de los litigios civiles que no presenten controversias genuinas de hechos materiales, razón por la cual no ameritan la celebración de un juicio en su fondo.[44] A esos efectos, "solamente debe ser dictada una sentencia sumaria en casos claros, cuando el Tribunal tenga ante sí la verdad sobre todos los hechos pertinentes".[45] Es decir, para que proceda dictar sentencia por la vía sumaria, es imprescindible que de los documentos que acompañan la solicitud o que obran en el expediente del tribunal no surja controversia legítima sobre hechos materiales del caso, y que, por ende, sólo reste aplicar el derecho.[46] Ahora bien, a los fines de considerar la moción, se tendrán como ciertos todos los hechos no controvertidos que consten en los documentos y declaraciones juradas ofrecidas por la parte promovente.[47] No obstante, tales documentos deben evaluarse de la forma más favorable para la parte que se opone a la moción.[48]

La Regla 36 de Procedimiento Civil regula todo lo concerniente a las solicitudes de sentencia sumaria. En específico, la Regla 36.3 (a) de Procedimiento Civil requiere que la parte que promueve la solicitud de sentencia sumaria cumpla con los requisitos de forma siguientes:

---

[43] *PFZ Props., Inc. v. Gen. Acc. Ins. Co.*, 136 DPR 881, 911 (1994).
[44] *García Rivera et al. v. Enríquez*, 153 DPR 323, 337 (2001); *Pilot Life Ins. Co. v. Crespo Martínez*, 136 DPR 624, 632 (1994).
[45] *PFZ Props., Inc. v. Gen. Acc. Ins. Co.*, supra, a las págs. 911-912, citando a *Corp. Presiding Bishop CJC of LDS v. Purcell*, 117 DPR 714, 721 (1986) (Cita depurada); *Cuadrado Lugo v. Santiago Rodríguez*, 126 DPR 272, 279 (1990).
[46] *Nissen Holland v. Genthaller*, 172 DPR 503, 511 (2007).
[47] *H.M.C.A. (P.R.), Inc., etc. v. Contralor*, 133 DPR 945, 957 (1993).
[48] *Íd.*, a la pág. 957.

(1) una exposición breve de las alegaciones de las partes;

(2) los asuntos litigiosos o en controversia;

(3) la causa de acción sobre la cual se solicita la sentencia sumaria;

(4) una relación concisa, organizada y con párrafos enumerados de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, indicando los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen estos hechos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal;

(5) las razones por las cuales se debe dictar sentencia argumentando el derecho aplicable, y

(6) el remedio que debe ser concedido.[49]

Cumplidos los requisitos establecidos para la solicitud de sentencia sumaria, el inciso (e) de la Regla 36.3 de Procedimiento Civil establece que:

> La sentencia solicitada será dictada inmediatamente si las alegaciones, deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas si las hay, u otra evidencia demuestran que no hay controversia real sustancial en cuanto a algún hecho esencial y pertinente y que, como cuestión de derecho, el tribunal debe dictar sentencia sumaria a favor de la parte promovente.[50]

No obstante, lo anterior, el solo hecho de no presentar evidencia que controvierta lo presentado por la parte promovente no implica necesariamente que proceda la sentencia sumaria.[51] Sobre este particular, el Tribunal Supremo ha resuelto que las partes no puede descansar en aseveraciones generales, es decir, meras afirmaciones no bastan.[52] A esos efectos, y a tenor con la Regla 36.5

---

[49] 32 LPRA Ap. V, R. 36.3.
[50] *Íd.*, R. 36.3 (e); *García Rivera et al. v. Enríquez,* supra, a la pág. 338; *Roldán Flores v. M. Cuebas,* 199 DPR 664, 676 (2018); *Lugo Montalvo v. Sol Meliá Vacation*, 194 DPR 209, 225 (2015).
[51] *PFZ Props., Inc. v. Gen. Acc. Ins. Co.*, supra, a la pág. 913; *García Rivera et al. v. Enríquez*, supra, a la pág. 338; *Consejo Tit. C. Parkside v. MGIC Fin. Corp.*, 128 DPR 538, 549 (1991); *Cuadrado Lugo v. Santiago Rodríguez*, 126 DPR 272, 281 (1990).
[52] *Flores v. Municipio de Caguas*, 114 DPR 521, 525 (1983); *Ramos Pérez v. Univisión*, 178 DPR 200, 215-216 (2010).

de Procedimiento Civil,[53] las partes estarán obligadas a demostrar que tienen evidencia para sustanciar sus alegaciones.[54]

Por otra parte, es menester subrayar que nuestro Tribunal Supremo ha indicado que el mecanismo de sentencia sumaria no es el apropiado para resolver casos en los cuales hay elementos subjetivos, de intención, propósitos mentales o negligencia, o cuando el factor de credibilidad sea esencial.[55] De la misma manera, también ha razonado que "hay litigios y controversias que por la naturaleza de estos no hacen deseable o aconsejable el resolverlos mediante una sentencia sumariamente dictada, porque difícilmente en tales casos el Tribunal puede reunir ante sí toda la verdad de los hechos a través de "affidavits' o deposiciones".[56]

En cuanto al proceso de revisión de las sentencias sumarias, nuestro Alto Foro ha sido enfático en que el Tribunal de Apelaciones debe:

> (1) examinar *de novo* el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil, *supra*, y la jurisprudencia le exigen al foro primario;
>
> (2) revisar que tanto la Moción de Sentencia Sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36;
>
> (3) revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos, y
>
> (4) de encontrar que los hechos materiales realmente están incontrovertidos, debe proceder a revisar *de novo* si el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia.[57]

Ahora bien, la sentencia sumaria no procederá en las instancias que: (i) existan hechos materiales y esenciales

---

[53] 32 LPRA Ap. V, R. 36.5.

[54] *Flores v. Municipio de Caguas*, supra, a la pág. 525; *Ramos Pérez v. Univisión*, supra, a las págs. 215-216.

[55] *Elías y otros v. Chenet y otros,* 147 DPR 507, 521 (1999); *Soto v. Hotel Caribe Hilton,* 137 DPR 294, 301 (1994); *Velázquez Ortiz v. Mun. de Humacao*, 197 DPR 656, 663 (2017).

[56] *Elías y otros v. Chenet y otros,* supra, a la pág. 521, citando a *García López v. Méndez García*, 88 DPR 363, 380 (1963).

[57] *Roldán Flores v. M. Cuebas, et al., supra,* 679. (Cita depurada); *Meléndez González et al. v. M. Cuebas*, 193 DPR 100, 118-119 (2015).

controvertidos; (ii) haya alegaciones afirmativas en la demanda que no han sido refutadas; (iii) surja de los propios documentos que se acompañan con la moción una controversia real sobre algún hecho material y esencial, o (iv) como cuestión de derecho, no proceda.[58] Además, al revisar la determinación del foro primario, respecto a una sentencia sumaria, estamos limitados de dos (2) maneras. *Primero*, solo podemos considerar los documentos que se presentaron ante el foro de primera instancia. Es decir, "las partes no pueden añadir en apelación exhibits, deposiciones o affidávits que no fueron presentados oportunamente en el foro de primera instancia, ni pueden, por primera vez ante el foro apelativo, esbozar teorías nuevas o esgrimir asuntos nuevos".[59] *Segundo*, solo podemos determinar si existe o no alguna controversia genuina de hechos materiales y esenciales, y si el derecho se aplicó de forma correcta.[60] Entiéndase, que al foro apelativo le es vedado adjudicar los hechos materiales esenciales en disputa, ya que dicha tarea le corresponde al foro de primera instancia.[61]

### B. La Doble Penalidad

Es norma harta conocida que las penalidades no se presumen y que la intención de su imposición debe surgir de manera clara y expresa.[62] Sobre este particular, nuestro Tribunal Supremo ha resuelto que "no importa cuán malamente se necesite una penalidad para beneficio del interés público, no tenemos poder para colocarnos en la posición de la Legislatura e imponer tal penalidad".[63]

Específicamente, la Ley de Vacaciones y Licencia por Enfermedad de Puerto Rico (Ley Núm. 180), crea una protección a

---

[58] *SLG Fernández-Bernal v. RAD-MAN et al.*, 208 DPR 310, 335-336 (2021).
[59] *Meléndez González et al. v. M. Cuebas, supra*, a la pág. 114. (Cita depurada).
[60] *Íd.*, a la pág. 115.
[61] *Vera v. Dr. Bravo*, 161 DPR 308, 335 (2004).
[62] *Colon Molinary v. AAA,* 103 DPR 143,157 (1974).
[63] *Cardona v. Corte*, 62 DPR 61, 78 (1943).

los trabajadores de empresas locales.[64] Asimismo, esta ley impone penalidades a los patronos cuando incumplen con las regulaciones laborales, por ejemplo, el salario mínimo.[65] Particularmente, la Ley Núm. 180, en su Artículo 6, provee un listado de quienes están excluidos por esta ley.[66] Como parte de esa exclusión, menciona a las "personas empleadas por el Gobierno de los Estados Unidos de América, por el Gobierno de Puerto Rico, con excepción de aquellas agencias o instrumentalidades de este que operen como negocios o empresas privadas."[67]

Por otro lado, la Ley para Establecer la Jornada de Trabajo en Puerto Rico (Ley Núm. 379), regula lo concerniente a la jornada laboral y los horarios de trabajo permitidos en nuestra jurisdicción, al igual que impone penalidades a dichos incumplimientos.[68] En su Artículo 13, la mencionada ley detalla una lista de quienes están excluidos por esta ley. Entre esa lista menciona, igualmente, a "personas empleadas por el Gobierno de Puerto Rico, incluyendo cada una de sus tres ramas y sus instrumentalidades o corporaciones públicas."[69]

En lo pertinente al caso de marras conviene mencionar que, mediante *Opinión*, y en respuesta a un recurso de *Certiorari* incoado previamente por la Universidad de Puerto Rico (UPR) en el caso de autos, el Tribunal Supremo enfatizó que la UPR es una corporación pública creada por ley.[70] Añadió que la referida institución universitaria, no es una agencia o instrumentalidad del gobierno que opera como un negocio privado.[71] Por lo cual, es de ver que las precitadas leyes no son aplicables a la UPR como patrono.

---

[64] Exposición de Motivos de la Ley Núm. 180 de 27 de julio de 1998, 29 LPRA sec. 250b *et seq.*
[65] *Íd.*
[66] *Íd.*, Artículo 6, 29 LPRA sec. 250f.
[67] *Íd.*, Artículo 6 (a) (1).
[68] Exposición de motivos de la Ley Núm. 379 de 15 de mayo de 1948, 29 LPRA sec. 271 *et seq.*
[69] *Íd.*, Artículo 13 (g), 29 LPRA sec. 285.
[70] *Rivera Torres v. UPR et al.*, 209 DPR 539, 553 (2022).
[71] *Rivera Torres v. UPR et al.*, *supra,* a la pág. 553.

### C. El Discrimen en el Empleo por Razones Religiosas

Sabido es que nuestra Constitución establece una prohibición sobre el discrimen de raza, color, sexo, nacimiento, origen, condición social e ideas políticas o religiosas.[72] En virtud de ello, se ha reconocido que "la inviolabilidad de la dignidad del ser humano es el principio cardinal sobre el cual se cimentan los derechos fundamentales de toda persona".[73] Como parte de esta prohibición, la Constitución añade que "[t]anto las leyes como el sistema de instrucción pública encarnarán estos principios de esencial igualdad humana."[74]

El Tribunal Supremo ha expresado que el discrimen está claramente prohibido, aun cuando ocurra contra empleados públicos que no tienen expectativa alguna de continuidad en el puesto.[75] Sin embargo, la mera alegación de discrimen no activa la presunción o inferencia de discrimen.[76] La parte que alega que sufrió discrimen viene obligada a establecer los criterios de un caso *prima facie* de discrimen, mediante preponderancia de prueba, de que la conducta protegida fue el factor sustancial para la acción de despido.[77]

Dicho lo anterior, nuestro más Alto Foro ha establecido los cuatro criterios para demostrar un caso *prima facie* de discrimen en un despido. Estos son: (1) que el empleado es miembro de un grupo protegido; (2) que el empleado estaba cualificado para el trabajo; (3) que el empleado fue despedido, y (4) que el patrono buscó reemplazar al empleado por otra persona con cualificaciones similares.[78]

---

[72] Artículo II, Sección 1, Const. ELA [Const. PR], LPRA, Tomo 1, ed. 2016.
[73] *Segarra Rivera v. Int'l Shipping et al,* 208 DPR 964, 987(2022).
[74] Artículo II, Sección 1 de la Const. PR, *supra.*
[75] *Aponte Burgos v. Aponte Silva,* 154 DPR 117, 128 (2001).
[76] *López v. Miranda,* 166 DPR 546, 561 (2005).
[77] *Íd.*
[78] *Soto y otros v. Sky Caterers,* 2025 TSPR 3, pág. 13, 215 DPR __ (2025).

Establecido lo anterior, se activará una presunción de que el empleado fue despedido por razones discriminatorias.[79] Sin embargo, la referida presunción puede ser derrotada por el patrono de tres (3) formas: "(1) derrotar el hecho básico —la ausencia de justa causa— (2) destruir el hecho presumido —que el despido fue por causa de motivos discriminatorios— o (3) destruir el hecho básico y el presumido a la vez".[80] Sobre este particular, nuestro Tribunal Supremo ha razonado que, para rebatir la presunción, basta con que el patrono pruebe que la razón para el despido no fue discriminatoria.[81] En otras palabras, "no se requiere que el patrono convenza al juzgador de que la razón proferida constituye la verdadera causa o, en estricto derecho, una justa causa para el despido, sino que meramente la evidencia debe ser lo suficientemente clara y específica para sostener que el motivo determinante no fue discriminatorio".[82]

Derrotada la presunción de discrimen, el empleado no tendrá otro remedio que, mediante preponderancia de prueba, demostrar la existencia de discrimen intencional, sin contar con la presunción.[83] Lo anterior, podrá lograrlo directamente, persuadiendo al juzgador que, con gran probabilidad hubo motivo discriminatorio, o indirectamente, exhibiendo que la explicación ofrecida por el patrono no es creíble.[84]

### D. La Imposición de Honorarios de Abogado por Temeridad

Los honorarios de abogado constituyen un estipendio o compensación que se paga al mismo por sus servicios

---

[79] *López Fantauzzi v. 100% Natural*, 181 DPR 92, 124 (2011).
[80] *Íd.*
[81] *Segarra Rivera v. Int'l Shipping et al,* supra, a la pág. 990.
[82] *Jiménez Soto y otros v. Carolina Catering Corp. y otros*, 2025 TSPR 3, pág. 26, 215 DPR ___ (2025).
[83] *Segarra Rivera v. Int'l Shipping et al,* supra, a la pág. 990.
[84] *Jiménez Soto y otros v. Carolina Catering Corp. y otros*, supra, a la pág. 26.

profesionales.[85] En el contexto del caso de marras, es necesario distinguir los honorarios de abogado regulados por la Ley que Regula la Concesión de Honorarios de Abogado en los Casos de Reclamaciones de Trabajadores o Empleados Contra sus Patronos (Ley Núm. 402),[86] y los honorarios de abogado que el Tribunal impone por temeridad, según definidos en las Reglas de Procedimiento Civil.[87] Por un lado, el Artículo 2 de la Ley Núm. 402 establece que:

> [e]n todo caso radicado ante las cortes de Puerto Rico por un trabajador o empleado en que se reclame cualquier derecho o suma de dinero contra su patrono, al amparo de la legislación laboral federal o local o convenio de trabajo de naturaleza individual o colectivo y en que se conceda la reclamación en todo o en parte, se condenará al patrono al pago de honorarios de abogado [. . .].[88]

Sobre este particular, nuestro Tribunal Supremo expresó que "en casos en los cuales un empleado reclame exitosamente contra su patrono, es el patrono quien debe pagar los honorarios del abogado que prestó servicios legales al reclamante."[89] Entiéndase que, para que proceda la imposición de honorarios se requiere la concurrencia de cuatro (4) condiciones. Estas son, que: (1) un empleado haga una reclamación a su empleador; (2) la reclamación surja al amparo de la legislación laboral; (3) el empleador sea un "patrono" bajo la ley, y (4) se conceda la reclamación.[90]

Por otro lado, la Regla 44 de Procedimiento Civil aborda lo relativo a costas, honorarios de abogado e interés legal. Esta tiene un fin de índole disuasivo, en otras palabras, desalentar los pleitos temerarios y superfluos.[91] En específico, la Regla 44.1 (d) de Procedimiento Civil dispone que:

---

[85] Rivera García, *Diccionario de términos jurídicos*, Lexis Publishing, San Juan, 2000, a la pág. 116.
[86] Ley Núm. 402 de 12 de mayo de 1950, 32 LPRA sec. 3114 *et seq.*
[87] 32 LPRA Ap. V.
[88] *Íd.,* 32 LPRA sec. 3115.
[89] *López Vicil v. ITT Intermedia, Inc.,* 143 DPR 574, 586 (1997).
[90] *Ortiz y otros v. Mun. de Lajas,* 153 DPR 744, 751 (2001).
[91] *J.T.P. Development Corp. v. Majestic Realty Corp.*, 130 DPR 456, 460 (1992).

> [e]n caso que cualquier parte o su abogado o abogada haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia al o a la responsable el pago de una suma por concepto de honorarios de abogado que el tribunal entienda corresponda a tal conducta. [. . .].[92]

El concepto temeridad no está expresamente definido por la Regla 44.1 (d) de Procedimiento Civil.[93] Sin embargo, la temeridad ha sido definida en la jurisprudencia como "toda aquella conducta que haga necesario un pleito que se pudo evitar, que lo prolongue innecesariamente o requiera a la otra parte efectuar gestiones innecesarias".[94]

Existen varias instancias bajo las cuales puede surgir temeridad, a saber: (i) contestar una demanda y negar responsabilidad total, aunque se acepte posteriormente; (ii) defenderse injustificadamente de la acción; (iii) creer que la cantidad reclamada es exagerada y que sea esa la única razón que se tiene para oponerse a las peticiones del demandante sin admitir francamente su responsabilidad, pudiendo limitar la controversia a la fijación de la cuantía a ser concedida; (iv) arriesgarse a litigar un caso del que se desprendía *prima facie* su responsabilidad, y (v) negar un hecho que le conste es cierto a quien hace la alegación.[95] Se desprende de los anteriores ejemplos que el propósito de la imposición de honorarios de abogado en casos de temeridad, es "establecer una penalidad a un litigante perdidoso que, por su terquedad, obstinación, contumacia e insistencia en una actitud desprovista de fundamentos, obliga a la otra parte, innecesariamente, a asumir las molestias, gastos, trabajo e inconveniencias de un pleito".[96]

---

[92] 32 LPRA Ap. V, R. 44.1 (d).
[93] *Fernández v. San Juan Cement Co., Inc.*, 118 DPR 713, 718 (1987).
[94] *Blas v. Hosp. Guadalupe,* 146 DPR 267, 335 (1998).
[95] *Íd.*, a las págs. 335-336.
[96] *Andamios de P.R. v. Newport Bonding,* 179 DPR 503, 520 (2010), citando a *Fernández v. San Juan Cement Co., Inc.*, supra, a la pág. 718.

Precisa señalar que, una vez el tribunal sentenciador concluye que una parte ha sido temeraria, es imperativa la imposición de honorarios de abogado.[97] No obstante, lo anterior, aclaramos que, aunque en la sentencia haya ausencia de una conclusión expresa de que una parte fue temeraria, un pronunciamiento en la sentencia condenando al pago de honorarios de abogado implica que el tribunal sentenciador consideró temeraria a la parte así condenada. Entiéndase que, al imponerle honorarios de abogado a una parte, el foro primario realizó una determinación de temeridad.[98]

Por último, huelga acentuar que la determinación de temeridad es de índole discrecional, por lo que los tribunales apelativos solo debemos intervenir con ella cuando nos enfrentemos a un caso en el cual se desprende diáfanamente un abuso de discreción.[99]

III

En la acción de título, el Tribunal de Primera Instancia, mediante el dictamen apelado, declaró *Ha Lugar* una solicitud de sentencia sumaria presentada por la parte apelada. En consecuencia, desestimó la demanda incoada. El apelante acude ante esta Curia tras su inconformidad con el dictamen desestimatorio y nos invita a concluir, en síntesis, que el foro *a quo* incidió al: (i) no imponer la doble penalidad en la sentencia a la parte apelada por alegada inexistencia de una penalidad en ley; (ii) al resolver sumariamente la controversia en torno al discrimen religioso utilizando prueba inadmisible y por existir alegaciones encontradas, y (iii) al imponer honorarios por temeridad en una reclamación laboral en contraposición a la Ley Núm. 402.[100] Luego

---

[97] *P.R. Oil v. Dayco*, 164 DPR 486, 511 (2005).
[98] *Rivera v. Tiendas Pitusa, Inc.*, 148 DPR 695, 702 (1999); *Montañez Cruz v. Metropolitan Cons. Corp.* 87 DPR 38, 40 (1962).
[99] *S.L.G. Flores–Jiménez v. Colberg*, 173 DPR 843, 866 (2008); *Colón Santos v. Coop. Seg. Mult. P.R.*, 173 *DPR* 170, 188 (2008).
[100] Ley Núm. 402, *supra.*

de haber evaluado el expediente judicial en su totalidad, los errores esgrimidos y las posiciones de las partes, consideramos que los errores deben ser discutidos por separado.

Comenzaremos por el *segundo* señalamiento de error. En este error, el apelante esgrime que el foro de instancia se equivocó al resolver la controversia sobre el alegado discrimen religioso de forma sumaria, tras utilizar prueba inadmisible y con alegaciones presuntamente encontradas.

Antes de adentrarnos en la discusión de este error, conviene recordar que, el foro de instancia tuvo ante su consideración una solicitud de sentencia sumaria con la correspondiente oposición y otros escritos relacionados. En síntesis, en su petitorio sumario, la parte apelada arguyó que no existía controversia real y sustancial con relación a los hechos materiales del caso de epígrafe. Añadió que, por error e inadvertencia el Departamento de Recursos Humanos de la UPR, omitió procesar una enmienda que extendía el contrato de empleo hasta el 31 de mayo de 2019. Por tal razón, la relación laboral culminó nueve (9) días previos a lo pactado. Debemos destacar que la UPR reconoció la deuda equivalente a la diferencia de días por la cantidad de mil cuatrocientos treinta y siete dólares con cincuenta y un centavos ($1,437.51). A tenor, peticionó que se dictara sentencia de conformidad a la cantidad adeudada en salarios, y que desestimara las reclamaciones de discrimen por razón de creencias religiosas y afiliación política, difamación y libelo.

Por otro lado, en la oposición a la solicitud de sentencia sumaria, el apelante negó varias de las alegaciones esbozadas en la solicitud de sentencia sumaria. Enfatizó que procedía la imposición de una doble penalidad de mil cuatrocientos treinta y siete dólares con cincuenta y un centavos ($1,437.51), equivalente a una suma igual a la adeudada por los salarios no pagados, en concepto de daños y perjuicios. De igual forma, arguyó que procedían sus

reclamaciones de discrimen por razones religiosas, difamación y libelo.

Evaluados sendos escritos, y según adelantamos, el tribunal apelado declaró *Ha Lugar* la solicitud interpuesta por la UPR y, en consecuencia, desestimó con perjuicio la demanda interpuesta por el aquí apelante y le condenó al pago de cinco mil dólares ($5,000.00) en honorarios de abogado por temeridad. Adicional, ordenó a la parte apelada a pagarle al señor Rivera Torres la suma de mil cuatrocientos treinta y siete dólares con cincuenta y un centavos ($1,437.51) por los salarios que la propia institución reconoció adeudar.

Es menester subrayar que, la revisión por este tribunal intermedio de la determinación de un foro primario, en cuanto a una moción de sentencia sumaria y su correspondiente oposición, es una revisión *de novo.* Siendo así, como cuestión de umbral, revisamos si la moción de sentencia sumaria, así como el escrito en oposición cumplieron con los requisitos de forma que dispone la Regla 36.3 (a) y (b) de las Reglas de Procedimiento Civil.[101] Luego de evaluado el expediente ante nuestra consideración, concluimos que la parte apelada cumplió cabalmente con los requisitos de forma en su moción en solicitud de sentencia sumaria. Sin embargo, a pesar de que el apelante presentó oposición a los hechos propuestos por la parte apelada, no logró controvertirlos de manera que el foro de instancia hubiese debido tomar un curso distinto al actuado. Conviene mencionar que, aunque la parte apelante anejó tres documentos en su oposición a la solicitud de sentencia sumaria, se limitó a fundamentar su oposición haciendo referencia a una declaración jurada otorgada por el propio apelante.

---

[101] 32 LPRA Ap. V, R. 36.3(a) y (b).

Establecido lo anterior, y conforme al señalamiento de error tal y cual esgrimido, analicemos la alegación del apelante en cuanto a que se equivocó el foro primario al resolver la controversia sobre el alegado discrimen religioso de forma sumaria, tras utilizar prueba inadmisible y con alegaciones presuntamente encontradas. Abundemos.

En lo relativo a las alegaciones sobre discrimen religioso, el apelante aduce que la decisión de la UPR sobre no renovarle el contrato de empleo obedeció a que este era agnóstico. Vemos, además, de la *Sentencia* apelada, que el foro *a quo* concluyó que, aunque el apelante tuvo un contrato a término fijo, y este no albergaba ninguna expectativa de continuidad de empleo, le cobijaba la protección constitucional sobre discrimen por motivos religiosos.[102] Sin embargo, sabido es que la mera alegación de discrimen no activa la presunción o inferencia de discrimen.[103] En otras palabras, y tal y como concluyó el foro de instancia, como parte de su carga probatoria, el apelante venía obligado a establecer los elementos de un caso *prima facie* de discrimen, así como el peso inicial de probar, con preponderancia de la prueba, que la conducta protegida fue el factor sustancial o motivante para su despido.[104] Forzosamente concluimos que lo anterior no ocurrió en el caso ante nos.

Por otro lado, nuestro ordenamiento establece que "no se requiere que el patrono convenza al juzgador de que la razón proferida constituye la verdadera causa o, en estricto derecho, una justa causa para el despido, sino que meramente la evidencia debe ser lo suficientemente clara y específica para sostener que el motivo determinante no fue discriminatorio".[105] De los autos se desprende

---

[102] Artículo II, Sección 1, Const. ELA, *supra.*
[103] *Díaz v Wyndham Hotel Corp.,* 155 DPR 364, 386 (2001).
[104] *McCrillis v Aut. Navieras de PR,* 123 DPR 113, 142 (1941).
[105] *Jiménez Soto y otros v. Carolina Catering Corp. y otros,* 2025 TSPR 3, 26, 215 DPR ___ (2025).

que, la parte apelada presentó evidencia que sostenía que la decisión de no renovar el contrato del apelante obedecía a razones distintas a las alegadas en la demanda de epígrafe.

Por todo lo anterior y revisada la totalidad de los autos ante nuestra consideración, coincidimos con el tribunal apelado en cuanto a las determinaciones de hecho emitidas, así como con las conclusiones a las que arribó cuando expresó que: (i) el apelante no sabía si la UPR lo sustituyó por razón de sus creencias religiosas y ni tan siquiera sabía si la UPR sabía de sus creencias religiosas; (ii) el apelante desconocía sobre las creencias religiosas de la profesora Lluveras Contreras, quien fue contratada por la UPR, y (iii) el apelante tampoco pudo demostrar con prueba alguna si la razón por la cual fue despedido fue luego de haberle cuestionado sobre la premisa de un examen que alegadamente ofendió al profesor Ortiz Ubarri. Con relación a este particular, el foro de instancia juzgó que lo anterior fue una mera especulación.

Del expediente ante nos y cónsono a lo resuelto por el foro de instancia, se desprende que, aunque en el segundo contrato de trabajo se incluía una cláusula que prohibía las prácticas discriminatorias en el lugar de empleo, según las propias admisiones del apelante, no quedó demostrado que la UPR conociera sus creencias religiosas ni tampoco que fue sustituido por esta razón. El tribunal *a quo* concluyó que procedía la desestimación de esta reclamación por insuficiencia de la prueba. Coincidimos con esta apreciación, puesto a que el apelante no logró controvertir lo alegado y fundamentado por la UPR en su solicitud de sentencia sumaria. Habida cuenta de ello, concluimos que el *segundo error* señalado no fue cometido.

Establecido todo lo anterior, pasemos a discutir el *primer* señalamiento de error. En este, el apelante esgrime que el tribunal de instancia se equivocó al no imponer la doble penalidad en la

sentencia bajo el fundamento de que no existe una penalidad en ley. Particularmente, el apelante plantea que, contrario a lo que determinó el foro primario, existe un remedio en ley bajo los preceptos de la Ley Núm. 180[106] y la Ley Núm. 379.[107] Alegó que, a tenor con las mencionadas leyes, procede imponer una doble penalidad a la parte apelada por el impago de salarios adeudados. Esta doble penalidad operaría como un remedio en concepto de liquidación de daños. Así pues, procede determinar si las mencionadas leyes son de aplicación a la UPR. Veamos.

Del propio texto de la Ley Núm. 180 se desprende que, están excluidas de esta legislación las personas que estén empleadas por el Gobierno de Puerto Rico, con excepción de aquellas agencias o instrumentalidades de este que operen como negocios o empresas privadas.[108] Por otro lado, la Ley Núm. 379, igualmente, excluye a todos los empleados del Gobierno de Puerto Rico.[109] Según expusimos en nuestra exposición doctrinal previa, mediante *Opinión* y en respuesta a un recurso de *Certiorari* incoado previamente por la UPR en el caso de autos, el Alto Foro enfatizó que la UPR es una corporación pública creada por ley.[110] Añadió que, la referida institución universitaria, no es una agencia o instrumentalidad del gobierno que opera como un negocio privado.[111] Por lo cual, es forzoso concluir que las disposiciones legales presentadas por la parte apelante no son aplicables a la UPR.

Lo anterior fue también discutido por el foro de instancia tras examinar la *Sentencia* objeto de revisión. Allí, pudimos constatar que el tribunal de instancia, al enfrentar esta controversia, concluyó que la solicitud del apelante no era de aplicabilidad al caso de

---

[106] Ley Núm. 180, *supra*
[107] Ley Núm. 379, *supra.*
[108] Artículo 6 de la Ley Núm. 180, *supra.*
[109] Artículo 13 de la Ley Núm. 379, *supra.*
[110] *Rivera Torres v UPR et al, supra,* a la pág.553.
[111] *Íd.,* a la pág.552.

marras. Específicamente, basó su determinación en lo resuelto en el caso *JRT v. Ventanas Yágüez*,[112] en el cual el Tribunal Supremo indicó que las penalidades no se presumen y su imposición se justifica solamente cuando la ley expresamente lo dispone. Así pues, en ausencia de una ley que sustente la imposición de la doble penalidad solicitada por el apelante, nos encontramos imposibilitados de ceder ante tal petición.

Por último, conviene añadir que el apelante solicitó la doble penalidad como una liquidación por los daños sufridos. Es bien sabido que, para recibir un remedio en daños, la parte promovente deberá probar que en efecto sufrió un daño, que hubo una acción u omisión negligente o culposa y la correspondiente relación causal entre ambos.[113] A falta de evidencia de la parte apelante sobre la existencia de un daño causado por la parte apelada, es improcedente imponer una penalidad en concepto de daños. Dado a lo anterior, coincidimos en que el foro de instancia actuó correctamente al no imponer el pago de la doble penalidad, por lo cual, el *primer error* no fue cometido.

En el *tercer* y último señalamiento de error el apelante nos convida a concluir que el tribunal apelado incidió al imponer al apelante honorarios por temeridad. Fundamentó su postura en que lo actuado por el foro apelado se encuentra en contraposición a los postulados de la Ley 402.[114] Abundamos.

Según hemos reseñado, el foro de instancia impuso la suma de $5,000.00 dólares por concepto de honorarios por temeridad, como parte de su dictamen desestimatorio. Lo anterior, luego de concluir que la conducta del apelante fue temeraria y tras haber asumido una actitud contumaz y obstinada, dirigida en provocar

---

[112] *JRT v. Ventanas Yágüez,* 103 DPR 933 (1975).
[113] *Valle v E.L.A.,* 157 DPR 1, 14 (2002).
[114] Ley Núm. 402, *supra.*

gastos y honorarios indebidos y excesivos en la tramitación del presente caso. En la *Sentencia,* el tribunal apelado ejemplificó instancias durante el litigio como base para justificar su curso decisorio.

Sabido es que la Regla 44.1 de Procedimiento Civil tiene el fin de desalentar los pleitos temerarios y superfluos.[115] En particular, la Regla 44.1 (d) dispone que, "[e]n caso que cualquier parte o su abogado o abogada haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia al o a la responsable el pago de una suma por concepto de honorarios de abogado que el tribunal entienda corresponda a tal conducta [. . .]."[116] Ahora bien, la determinación de temeridad por el foro primario es de índole discrecional, por lo que los tribunales apelativos solo debemos intervenir con ella cuando nos enfrentemos a un caso de abuso de discreción.[117] Ello, puesto que, una vez el tribunal sentenciador concluye que una parte ha sido temeraria, es imperativa la imposición de honorarios de abogado.

Por otro lado, puntualizamos que el apelante trae a colación la Ley Núm. 402, por entender que la protección contra el pago de honorarios de abogado contenida en ella es de aplicación al caso de autos. La precitada ley establece que, es el patrono quien debe pagar honorarios de abogado en los "casos radicados ante las cortes de Puerto Rico por un trabajador o empleado en que se reclame cualquier derecho o suma de dinero contra su patrono."[118] Resulta imperativo destacar que, los honorarios impuestos por el foro primario a la parte apelante fueron por razón de una penalidad por conducta temeraria de esta parte, la cual insistimos fue detallada por el foro de instancia en su dictamen. Subrayamos que, estos

---

[115] *JTP Development Corp. V Majestic Realty Corp.,* 130 DPR 456, 460 (1992).
[116] 32 LPRA Ap. V, R. 44.1 (d).
[117] *P.R. Oil v. Dayco,* supra*,* a la pág. 511.
[118] 32 LPRA sec. 3114, *supra.*

honorarios por temeridad no son análogos a los honorarios de abogado según definidos en la precitada Ley. Por lo cual, no procede el planteamiento de la parte apelante. Es por las razones expuestas que consideramos que el *tercer* error no fue cometido.

Por todo lo antes expuesto y luego de haber estudiado minuciosamente la totalidad de los autos ante nuestra consideración procede confirmar la *Sentencia* apelada.

IV

Por los fundamentos que anteceden, se *confirma* la *Sentencia* apelada.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones